**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ X

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
|  | : | **Case No. 09-13764 (JMP)** |
| EXTENDED STAY INC., et al., | : |  |
|  | : | **Jointly Administered** |
| Debtors. | : |  |

------------------------------------------------------------------------ X

|  |  |  |
|---|---|---|
| BANK OF AMERICA, N.A.; WACHOVIA BANK, | : |  |
| N.A; and U.S. BANK NATIONAL ASSOCIATION, | : |  |
| as TRUSTEE for MAIDEN LANE COMMERCIAL | : |  |
| MORTGAGE BACKED SECURITIES TRUST 2008-1, | : |  |
|  | : |  |
| Plaintiffs, | : | **Case No. 09-9507 (LTS)** |
|  | : |  |
|  | : |  |
| -against- | : |  |
|  | : |  |
| LIGHTSTONE HOLDINGS, LLC and | : |  |
| DAVID LICHTENSTEIN, | : |  |
|  | : |  |
| Defendants. | : |  |

------------------------------------------------------------------------X

---

**BRIEF FOR APPELLANTS LIGHTSTONE HOLDINGS, LLC**
**AND DAVID LICHTENSTEIN**

---

David M. Friedman (dfriedman@kasowitz.com)
Christopher P. Johnson (cjohnson@kasowitz.com)
Adina G. Storch (astorch@kasowitz.com)
KASOWITZ, BENSON, TORRES
& FRIEDMAN LLP
1633 Broadway
New York, NY  10019
Telephone:  (212) 506-1700
Facsimile:  (212) 506-1800
*Attorneys for Appellants Lightstone Holdings, LLC*
*and David Lichtenstein*

# TABLE OF CONTENTS

**STATEMENT OF APPELLATE JURISDICTION**................................................................. 1

**ISSUE PRESENTED** .......................................................................................................... 1

**STANDARD OF APPELLATE REVIEW** ............................................................................. 1

**STATEMENT OF THE CASE**

I.    Nature of the Case................................................................................................... 2

II.   Course of Proceedings and Disposition Below....................................................... 6
      A. The Acquisition of the Extended Stay
         Hotel Portfolio ................................................................................................... 7
      B. The Guarantees ................................................................................................. 7
      C. The Dispute Among Creditors that Caused the
         Bankruptcy Filing ............................................................................................. 8

**ARGUMENT**

I.    The Adversary Proceeding Presents Bankruptcy
      Issues Squarely Within the Bankruptcy Court's "Core
      Subject Matter Jurisdiction ................................................................................... 10
      A. The Adversary Proceeding is "Core" Because Liability
         Necessarily Depends Upon an "Ipso Facto" Clause
         Prohibited by the Bankruptcy Code................................................................ 11
      B. Because the Imposition of Penalties Based Upon a
         Bankruptcy Filing is Exclusively Reserved to the
         Federal Courts, Appellees' Claims are Preempted by
         Federal Law ..................................................................................................... 13
      C. Because the Guarantees Encumber Access to
         Bankruptcy and the Proper Exercise of Fiduciary
         Duties, They Are Void as a Matter of Public Policy ...................................... 16
      D. The Adversary Proceeding "Arises In" the Bankruptcy
         Code Because the Debtors' Filing of Their Bankruptcy
         Petition Triggered the Adversary Proceeding................................................. 20

II.   Because the Adversary Proceeding May Give Rise
      to Indemnification Rights Against, and Potential
      Liability of, the Debtors, It Threatens an Adverse
      Impact on the Handling and Distribution of the
      Bankruptcy Estate ................................................................................................ 21

## TABLE OF AUTHORITIES

CASES

Astor Holdings, Inc. v. Roski,
  325 F. Supp. 2d 251 (S.D.N.Y. 2003)........................................................................ 15
D.A. Elia Constr. Corp. v. Damon & Morey, LLP,
  389 B.R. 314 (W.D.N.Y. 2008)................................................................................. 21
Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank,
  236 F.3d 117 (2d Cir. 2001)............................................................................... 15, 20
Ex parte Smith, 942 So. 2d 356 (Ala. 2006)..................................................................... 17
Geruschat v. Ernst Young LLP,
  505 F.3d 237 (3d. Cir.)..................................................................................... 20, 21
Gonzales v. Parks,
  830 F.2d 1033 (9th Cir. 1987) ....................................................................... 14, 16, 20
Gulf Ins. Co. v. Glasbrenner,
  343 B.R. 47 (S.D.N.Y. 2006)...................................................................................... 1
Hickox v. Leeward Isles Resorts,
  224 B.R. 533 (S.D.N.Y. 1998).................................................................................. 25
In re 2218 Bluebird Ltd. P'ship,
  41 B.R. 540 (Bankr. S.D. Cal. 1984) ......................................................................... 14
In re Ames Dept. Stores, Inc.,
  582 F.3d 422 (2d Cir. 2009)........................................................................................ 1
In re Chateaugay Corp., No. 92-7054 (PKL),
  1993 U.S. Dist. LEXIS 6130 (S.D.N.Y. May 10, 1993) ............................................ 11
In re Chedick, No. 95-01096,
  1996 WL 762329 (Bankr. D.D.C. Mar. 22, 1996)..................................................... 13
In re Cuyahoga Equip. Corp.,
  980 F.2d 110 (2d Cir. 1992)...................................................................................... 21
In re Farmland Industries, Inc.,
  296 B.R. 497 (Bankr. W.D. Mo. 2003)...................................................................... 13
In re Global Serv. Group LLC,
  316 B.R. 451 (Bankr. S.D.N.Y. 2004)....................................................................... 16
In re Lucasa Int'l, Ltd.,
  6 B.R. 717 (Bankr. S.D.N.Y. 1980) .......................................................................... 20
In re Lyondell,
  402 B.R. 571 (Bankr. S.D.N.Y. 2009) ...................................................................... 24
In re Madison,
  184 B.R. 686 (Bankr. E.D. Pa. 1995) ........................................................................ 17
In re Masterwear Corp.,
  241 B.R. 511 (Bankr. S.D.N.Y. 1999)....................................................................... 22
In re New York Int'l Hostel, Inc.,
  157 B.R. 748 (S.D.N.Y. 1993)..................................................................................... 1
In re Pacor, Inc. v. Higgins,
  743 F.2d 984 (3d Cir. 1984)........................................................................... 21, 22, 23
In re Pease,
  195 B.R. 431 (Bankr. D. Neb. 1996) ......................................................................... 16

In re Rome Family Corp., No. 02-11771, 04-1048,
   2005 WL 1030425 (Bankr. D. Vt. May 2, 2005) ................................................... 23
In re Texaco Inc.,
   73 B.R. 960 (S.D.N.Y. 1987) ................................................................................. 11
In re Tru Block Concrete Prods., Inc.,
   27 B.R. 486 (Bankr. S.D. Cal. 1983) ..................................................................... 17
In re Vienneau,
   410 B.R. 329 (Bankr. D. Mass. 2009) .................................................................... 13
In re Villareal,
   46 B.R. 284 (Bankr. C.D. Cal. 1984) ..................................................................... 15
In re Wilborn,
   401 B.R. 872 (Bankr. S.D. Tex. 2009) ................................................................... 13
In re Worldcom,
   293 B.R. 308 (S.D.N.Y. 2009) ............................................................................... 24
Industri & Skipsbanken A/S v. Levy,
   183 B.R. 53 (Bankr. S.D.N.Y. 1995) ..................................................................... 23
JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC, Adv. No. 09-01132 (JMP),
   2009 Bankr. LEXIS 1738 (Bankr. S.D.N.Y. July 7, 2009) .............................. 18, 24
JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC, Adv. No. 09-01132 (JMP),
   2009 Bankr. LEXIS 3609 (Bankr. S.D.N.Y. Nov. 17, 2009) ................................. 11
Marquart v. Lodge 837, Int'l Ass'n of Machinists and Aerospace Workers,
   26 F.3d 842 (8th Cir. 1994) ................................................................................... 19
MSR Exploration, Ltd. v. Meridian Oil, Inc.,
   74 F.3d 910 (9th Cir. 1996) ................................................................................... 20
Nemsa Establishment, S.A. v. Viral Testing Sys. Corp., No. 95-0277,
   1995 WL 489711 (S.D.N.Y. Aug. 15, 1995) ..................................................... 21, 22
Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union,
   222 F. Supp. 125 (E.D.N.Y. 1963) ........................................................................ 18
Phoenix Elec. Contracting, Inc. v. Lovece, No. 93-4340 (LMM),
   1993 WL 512917 (S.D.N.Y. Dec. 9, 1993) ............................................................ 16
River Ctr. Holdings, LLC v. Korff,
   288 B.R. 59 (Bankr. S.D.N.Y. 2003) ............................................................ 22, 23, 24
Sirkin v. The Fourteenth St. Store,
   124 A.D. 384 (N.Y. App. Div. 1st Dep't  1908) ..................................................... 18
Stearns v. Williams,
   240 P.2d 833 (Idaho 1952) ..................................................................................... 17
Stewart v. U.S. Bancorp,
   297 F.3d 953 (9th Cir. 2002) ................................................................................. 14
U.S. Lines, Inc.,
   103 B.R. 427 (Bankr. S.D.N.Y. 1989) ............................................................... 17, 24
U.S. v. Royal Bus. Funds Corp.,
   724 F.2d 12 (2d Cir. 1983) .................................................................................... 17
Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n, Inc.,
   441 A.2d 956 (D.C. Ct. App. 1982) ....................................................................... 17

**STATUTES**

11 U.S.C. § 303 ......................................................................................................... 15
11 U.S.C. § 363 ..................................................................................................... 4, 11
11 U.S.C. § 365 ..................................................................................................... 4, 11
11 U.S.C. § 541 ..................................................................................................... 4, 11
28 U.S.C. § 158 ........................................................................................................... 1
28 U.S.C. § 1334 ................................................................................................... 1, 13
Fed. R. Bankr. P. 9011 .............................................................................................. 15

**OTHER AUTHORITIES**

1-3 Collier on Bankruptcy ¶¶ 3.01, 105.03, 365.07
     (Matthew Bender 15th Ed. rev.) .................................................. 11, 21, 22, 23, 24
7A William Meade Fletcher et al., Fletcher Cyc. Corp.
     § 3612 (perm. ed., rev. vol. 2009).......................................................................... 18
Michael D. Fielding, Preventing Voluntary and Involuntary
     Bankruptcy Petitions by Limited Liability Companies,
     18 Bank. Dev. J. 51, 64-66 (2001) ....................................................................... 18
Restatement (Second) of Contracts § 193 (1981) ....................................................... 17

Appellants Lightstone Holdings, LLC ("Lightstone"), and David Lichtenstein ("Lichtenstein") (together, "Appellants") submit this brief in support of their appeal from the *Order Remanding Adversary Proceeding* and *Memorandum Decision* (together, the "Remand Order") entered by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") in the above-captioned adversary proceeding (the "Adversary Proceeding" or "State Court Action") on October 7, 2009.[1]

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(a)(1) because the Bankruptcy Court's Remand Order was a final order.

## ISSUE PRESENTED

Whether the Bankruptcy Court erred in remanding the Adversary Proceeding to the Supreme Court of the State of New York based upon its determination that it did not have subject matter jurisdiction under 28 U.S.C. § 1334.[2]

## STANDARD OF APPELLATE REVIEW

On appeal, a district court reviews a bankruptcy court's conclusions of law *de novo*, and reviews findings of fact for clear error. See In re Ames Dept. Stores, Inc., 582 F.3d 422, 426 (2d Cir. 2009); Gulf Ins. Co. v. Glasbrenner, 343 B.R. 47, 55 (S.D.N.Y. 2006). "The question of subject matter jurisdiction is reviewed de novo." In re New York Int'l Hostel, Inc., 157 B.R. 748, 750 (S.D.N.Y. 1993); Glasbrenner, 343 B.R. at 55.

---

[1] Except as otherwise noted, all references to "J. App. Tab" are to the Joint Appendix of Appellants and Appellees for Case No. 09-09507 (LTS). References to the Remand Order ("Ord.") herein are to J. App. Tab 14.

[2] Because the Bankruptcy Court reached its decision based upon a finding that subject matter jurisdiction did not exist, the Bankruptcy Court did not deem it necessary to reach the issue of abstention. (Ord. at 16.) Consequently, Appellants have confined their arguments herein to those relating to subject matter jurisdiction only. In opposing the Remand Motion below, however, Appellants addressed the many reasons why mandatory and permissive abstention, as well as discretionary remand, also are inappropriate here. (J. App. Tab 10 at 28-37.)

**STATEMENT OF THE CASE**

I. **Nature of the Case**

On June 15, 2009, in compliance with his fiduciary duties as Chairman and Chief Executive Officer of Extended Stay, Inc. and its affiliates ("ESI" or the "Debtors"), and to stabilize and maximize the value of those entities for the benefit of their creditors (including Appellees), Lichtenstein approved the filing of voluntary Chapter 11 petitions for the Debtors (the "Bankruptcy Case").  Had that Chapter 11 filing not occurred, ESI was at risk of defaulting on payroll obligations to thousands of employees and jeopardizing its operations in more than 600 hotels. The very next day, Appellees commenced the instant action against the non-debtor Appellants in the Supreme Court of the State of New York, New York County (the "State Court") for enforcement of an aggregate of $100 million in "springing" guarantees (each, a "Guaranty"; together, the "Guarantees").[3]

Liability under the Guarantees derives in the first instance from ESI's primary liability to Appellees, if any, under a series of mortgage and mezzanine loan agreements (collectively, the "Loan Agreements").[4]  In their State Court Action, Appellees predicated such primary liability upon a so-called "bad boy" provision in the Loan Agreements, pursuant to which fraud, intentional damage to, or physical waste of, ESI's properties, or misapplication or conversion of lender funds, subjected the Debtors to full recourse liability and constituted "carve-outs" from an otherwise non-recourse loan.  Appellees, however, did not allege any of those acts as predicates to liability. Instead, as the Bankruptcy Court noted in its Remand Order (Ord. at 15), ESI's bankruptcy filing, which was also included in the recourse carve-out list, constituted the sole "bad boy" act upon which Appellees predicated their State Court Action.  Stated otherwise, Appellees' State Court

---

[3] Although the Guarantees are all substantially identical, at issue here are Guarantees A through E, each dated June 11, 2007.  References to the "Guaranty" or "Guarantees" herein will be to the Mezzanine A Guaranty, previously submitted by Appellees as an exemplar "identical in all relevant aspects" to Guarantees B through E.  (See J. App. Tab 7 Ex. E.)

[4] References to the Loan Agreements herein will be to the Mezzanine A Loan Agreement ("Loan Agreement"), which is identical in all relevant respects to the mortgage and other mezzanine loan agreements.  The Mezzanine A Loan Agreement is appended at J. App. Tab 7 Ex. D.

Action attempts to punish Appellants to the tune of $100 million simply for having exercised their fiduciary duty to protect creditors, over 10,000 employees and other stakeholders by filing for bankruptcy protection – hardly a "bad boy" act at all.

Appellants removed the State Court Action to federal court for several reasons.  First, it raises important federal public policy questions that can only be addressed by a federal court – <u>viz.</u>, whether a court can enforce contract clauses that trigger a debtor's liability solely upon a bankruptcy filing, or that create financial disincentives against the proper exercise of fiduciary duties that otherwise require a bankruptcy filing.  Second, the State Court Action seeks to undermine the Bankruptcy Case, because the naked purpose of the Guaranty claims is not actually to collect $100 million – the intertwining of the bankruptcy, the Guarantees, and a related Intercreditor Agreement[5] subordinating Appellees' claims prevent that – but simply to gain negotiating leverage in ESI's eventual plan of reorganization.  Thus, the State Court Action is nothing more than an attempt by Appellees – junior mezzanine lenders in a complex real estate financing transaction – to circumvent their subordinate position in ESI's capital structure by grabbing assets that would otherwise be beyond their reach.  Nothing reveals Appellees' gamesmanship more than their telling decision not to sue two Debtor entities that were also guarantors under the Guarantees – for fear of invoking the automatic stay under 11 U.S.C. § 362 and thereby defeating their underlying purpose of launching a collateral attack on, and hedging the outcome in, the Bankruptcy Case.  For all these reasons and more, the State Court Action is both "core" and "related to" the ESI bankruptcy, as it will have a material impact on the handling and administration of the Debtors' bankruptcy estate.

Notwithstanding the dispositive federal issues inherent in the State Court Action, the Bankruptcy Court issued an order remanding this case back to State Court.  The Bankruptcy Court predicated its Remand Order upon an erroneous finding that it lacked federal subject matter

---

[5] The mortgage and mezzanine lenders entered into an intercreditor agreement (the "Intercreditor Agreement") that governs their respective rights and interests, including in the event of a bankruptcy filing by the Debtors.  (J. App. Tab 11 Ex. 3.)

jurisdiction, reasoning that "Bank of America's efforts to recover the guaranteed obligations . . . do not directly impact the Debtors" and "the state law action has no foreseeable connection to the Debtors." (Ord. at 14-16.) In so holding, the Bankruptcy Court erred by failing to consider, among other things, the following federal issues:

First, any non-debtor liability under the Guarantees purportedly triggered by the bankruptcy filing is wholly derivative of the Debtors' primary recourse liability, if any, under the Loan Agreements. The enforceability of any primary liability of the Debtors, however, is subject to the prohibition on "*ipso facto*" clauses – *i.e.*, agreements that predicate liability or certain rights upon the filing of bankruptcy – codified in Sections 365(e), 541 and 363 of the Bankruptcy Code. The determination as to whether primary liability – and consequently, secondary liability on the Guarantees – is enforceable must necessarily be made by a federal court as it involves construction of the federal statutory provisions pertaining to the Debtors' liability under *ipso facto* clauses. Accordingly, the State Court Action quintessentially "arises under" Title 11.

Second, under the Bankruptcy Code, bankruptcy courts have the exclusive authority to adjudicate claims for damages or penalties incident to a bankruptcy filing. As Appellees freely admit, it was exclusively the Debtors' bankruptcy filing that gave rise to their cause of action. Since liability under the Guarantees is tantamount to a penalty or sanction based upon the act of filing, assessment of damages thereunder, if any, is exclusively reserved for the federal courts, because there are important federal policy interests in protecting access to bankruptcy protection. Accordingly, Appellees' state law claims should have been preempted by the Bankruptcy Code.

Third, this case implicates the important policy question of whether contractual disincentives against the filing of bankruptcy can properly be enforced against a corporate officer or director whose fiduciary duties oblige him to authorize such a filing. In placing creditors' interests above their own by authorizing the Debtors' bankruptcy filing, Appellants vindicated the very public policy aims that bankruptcy law seeks to protect: the unencumbered access to bankruptcy protection to maximize enterprise value, stabilize assets, and preserve jobs. Contracts that seek, through penalties or otherwise, to restrict a party's access to bankruptcy, to disincentivize

the exercise of fiduciary obligations that lead to a bankruptcy filing, or to create potential tort liability against a party for authorizing a bankruptcy filing, are void both under the Bankruptcy Code and as a matter of public policy, regardless of whether such contracts actually deter a bankruptcy filing.  At the very least, this determination – involving the important federal policy interest in safeguarding access to bankruptcy – must be decided by a federal court.

Fourth, and finally, there is an unmistakable nexus between the State Court Action and the Bankruptcy Case such that any outcome in the State Court Action will have a significant and undeniable impact upon the administration of the bankruptcy estate.  Because two of the Debtors, ESI and Homestead Village L.L.C. ("Homestead") (together, "Debtor Guarantors"), are jointly and severally liable with the non-debtor Appellants under the Guarantees, any determination of Appellants' liability under the Guarantees will necessarily impact the legal rights and financial liabilities of the Debtors.  Similarly, under Section 10.13 of the Loan Agreements, the Appellees have a claim against the Debtors' estate for indemnification of all costs associated with prosecuting the Guaranty action.  Moreover, since any amounts awarded to Appellees under the Guarantees would proportionately reduce their claims against the ESI estate, the cascade of bankruptcy distributions to lenders beneath Appellees in the capital stack would necessarily be altered.  Also, the various subordination and turnover provisions contained in the Intercreditor Agreement, among other loan documents, would, in any event, require a redistribution of any recovery awarded on the Guarantees according to the contractual priority order governing the lenders.  Consequently, because the State Court Action will have a "conceivable effect," if not an overwhelming impact, on the bankruptcy estate, the Bankruptcy Court should have retained jurisdiction on this basis alone.

Only a federal court may properly evaluate the federal public policies that are implicated by Appellees' attempt to encumber the exercise of rights under Chapter 11, and related standing, damages, subordination and indemnification issues inextricably tied to the Bankruptcy Case. Accordingly, Appellants properly removed the State Court Action to federal court, and this Court should reverse the Bankruptcy Court's Remand Order.

## II.  Course of Proceedings and Disposition Below

On June 16, 2009 – the day immediately following the Debtors' bankruptcy filing –
Appellees filed a summons with notice in the State Court seeking to enforce rights under their
respective Guarantees through a motion for summary judgment in lieu of complaint.  (J. App. Tab
7 Ex. B.)  On July 8, 2009, Appellants removed the action to the United States District Court for
the Southern District of New York (J. App. Tab 5) ("Notice of Removal"), which referred the
action to the Bankruptcy Court pursuant to the District Court's Standing Order.  The next day, on
July 9, 2009, Appellees served Appellants with an amended summons and motion for summary
judgment in lieu of complaint seeking payment of $100 million, plus pre-judgment interest, costs
and expenses under the Guarantees.  (J. App. Tab 10 at 7-8.)  On July 17, 2009, Appellees filed
their Remand Motion and supporting Memorandum of Law, and on July 24, 2009, Appellee
Wachovia filed a Statement in Response to Appellants' Notice of Removal.  (J. App. Tabs 6, 8.)

Following briefing by Appellants, Appellees and Debtors,[6] the Bankruptcy Court heard
oral argument on the Remand Motion on September 10, 2009 (the "Hearing", Tr. at J. App. Tab 3),
but reserved its ruling.  On September 22, 2009, the Bankruptcy Court issued a bench ruling
granting Appellees' Remand Motion (J. App. Tab 4), but withheld issuing an order until it handed
down a written opinion.  On October 7, 2009, the Court then issued its Remand Order remanding
the instant Adversary Proceeding to the State Court.  (J. App. Tab 14.)  Appellants timely filed
their notice of appeal on October 16, 2009 and filed their Statement of Issues and Designation of
Record on Appeal on October 26, 2009.  (J. App. Tab 16.)  The Debtors also filed a timely notice
of appeal on October 22, 2009, and a Statement of Issues and Designation of Record on Appeal,
along with a Supplement thereto, respectively, on November 2, 2009 and November 13, 2009.  (J.
App. Tab 18.)

In granting the Appellees' Remand Motion, the Bankruptcy Court held that it lacked
subject matter jurisdiction.  (Ord. at 16.)  The Bankruptcy Court premised this conclusion upon its

---

[6] Appellants' Opposition, Debtors' Opposition and Appellees' Reply Briefs are respectively
appended at J. App. Tabs 10, 9 and 12.

erroneous belief that i) the State Court Action does not "arise under," and is not preempted by, the Bankruptcy Code, and does not "arise in" the Bankruptcy Case; ii) public policy arguments about adverse incentives are inapplicable here, where the disincentives did not actually deter the Debtors' bankruptcy filing; and, iii) because the Guarantees contain no right of indemnification or offset against the Debtors, there is no conceivable impact on the Debtors' estate or the Bankruptcy Case. The error in each of these three reasons is discussed below.

## STATEMENT OF FACTS

### A.  The Acquisition of the Extended Stay Hotel Portfolio

In June 2007, Appellant Lichtenstein, together with an investment consortium, purchased the ESI chain of hotels for approximately $8 billion (the "Acquisition").  ESI is the largest owner and operator of mid-priced extended stay hotels in the United States, owning or leasing over 680 properties across 44 states and two Canadian provinces that operate under five hotel brands.  (J. App. Tab 2 ¶ 5.)  Lichtenstein then became ESI's President, Chief Executive Officer and Chairman.  Appellant Lightstone is owned by Lichtenstein and, like Lichtenstein, holds direct and indirect equity interests in ESI.  (Id. ¶¶ 10, 18.)

Of the $8 billion purchase price, $7.4 billion was financed through a combination of: (i) a mortgage loan in the principal amount of $4.1 billion, and (ii) an aggregate of $3.3 billion in ten mezzanine loan tranches designated A through J made to various ESI subsidiaries (together, the "Loans").  (Id. ¶ 16.)  Some of the original Loans were subsequently securitized and resold to, among others, Appellees, who purchased debt corresponding to mezzanine loans A through E.  (J. App. Tab 7 Ex. B ¶ 17.)

### B.  The Guarantees

As outlined in the Loan Agreements (J. App. Tab 7 Ex. D), the Loans are generally non-recourse, meaning that, in case of a borrower default, the lenders may foreclose on their collateral but typically may not seek a money judgment against the borrower.  (Loan Agreements § 9.4(a).)  Upon the occurrence of certain enumerated "bad boy" acts, however, the Loans become fully

recourse to the borrowers (*i.e.*, the Debtors).  (See id. § 9.4(b).)  Such "bad boy" acts include the

commission of fraud, conversion, waste, misapplication of funds, breach of warranty regarding

asbestos or other hazardous substances, failure to pay charges that result in liens, and failure to

permit inspection or to provide financial information to lenders.  (See id. § 9.4(a).)

Section 9.4(a)(xiv)(A) then includes as a "bad boy" act the filing of a voluntary or involuntary

bankruptcy petition by any of the ESI borrowers or their affiliates.

        In connection with the Acquisition, the lenders on the various Loans required each of the

Appellants and Debtor Guarantors to sign, contemporaneously with the Loan Agreements, non-

recourse carve-out Guarantees whereby the Guarantors jointly and severally guaranteed up to

$100 million in the aggregate of the Debtors' primary obligations, but only to the extent such

obligations are enforceable against the Debtors.  (Id. § 9.4.)  Specifically relevant to the instant

case is the guaranty of the Debtors' springing recourse obligation upon their filing for bankruptcy.

        Of central importance here is that the Guarantors' liability under the Guarantees is entirely

secondary to, derivative of, and contingent upon the Debtors' primary liability under the Loan

Agreements.  Stated differently, because the Guaranty merely backstops "the obligations or

liabilities of [the Debtors]" under Section 9.4 of the Loan Agreements, if the Debtors' primary

obligation under Section 9.4 is held to be unenforceable – as a matter of bankruptcy law, as against

public policy or for some other reason – then the Guarantors have no liability under the

Guarantees.  (J. App. Tab 7 Ex. E; Guar. §§ 1.1, 1.2.)  In fact, the Guarantees expressly

contemplate that their effect may be limited by public policy considerations and/or the Debtors'

filing for bankruptcy.  (Id. § 3.5.)

## C.  The Dispute Among Creditors that Caused the Bankruptcy Filing

        After the June 2007 Acquisition, ESI struggled to operate in a deteriorating economic

environment.  The unprecedented collapse of the financial, credit and real estate markets drove

down ESI's enterprise value and eroded its customer base, which consists principally of business

travelers on extended relocations.  (J. App. Tab 2 ¶¶ 6, 25-26.)  Unable both to fund its operations

and service its debt, Appellants and ESI determined that ESI needed a comprehensive restructuring of its capital structure.  Accordingly, Appellant Lichtenstein spent approximately nine months trying to negotiate a recapitalization with mortgage and mezzanine lenders, including the Appellees.  (Id. ¶ 30.)  Due to infighting among ESI's lenders, including Appellees, such negotiations ultimately failed.  (Id. ¶ 31.)

On May 27, 2009, one of ESI's mortgage lenders sent a letter to ESI's Board of Directors, asserting that Lichtenstein's pursuit of an out-of-court debt restructuring was "a blatant breach of [his] fiduciary responsibilities to [ESI] and its stakeholders," and exhorted ESI's Board that its fiduciary duties required it to commence Chapter 11 bankruptcy proceedings, or pursue similar strategic alternatives.  (J. App. Tab 11 Ex. 4.)  In consultation with other ESI directors and officers, Lichtenstein determined that a voluntary bankruptcy petition was the best – if not only – way to preserve and maximize the value of ESI for its creditors and to avoid massive operational layoffs to ESI's workforce of over 10,000 employees.  (J. App. Tab 2 ¶¶ 8, 14, 33-34.)

Accordingly, on June 15, 2009, ESI filed a voluntary petition under Chapter 11 of Title 11 of the United States Bankruptcy Code, which is currently pending before the S.D.N.Y. Bankruptcy Court as Case No. 09-13764.  In connection with their first day papers, the Debtors filed a proposed plan of reorganization outlining a recapitalization of ESI (the "Term Sheet").  (J. App Tab 2 Ex. C.)  Since the petition date, the Debtors have operated as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

## ARGUMENT

### THIS COURT SHOULD REVERSE THE REMAND ORDER BECAUSE THE ADVERSARY PROCEEDING PLAINLY INVOLVES FEDERAL QUESTIONS

In remanding the Adversary Proceeding, the Bankruptcy Court committed fundamental and reversible error.  Stated simply, the Bankruptcy Court failed to recognize that, by virtue of federal issues necessarily embedded within the Adversary Proceeding, the Adversary Proceeding constitutes a "core" bankruptcy proceeding over which the Bankruptcy Court has exclusive subject

matter jurisdiction.  Even aside from the Adversary Proceeding's "core" nature, its resolution would impact the Debtors' estate in a way that brings it clearly within the Bankruptcy Court's "related to" jurisdiction.  For these reasons, this Court should reverse the Bankruptcy Court's Remand Order.

**I.   The Adversary Proceeding Presents Bankruptcy Issues Squarely Within the Bankruptcy Court's "Core" Subject Matter Jurisdiction**

The Adversary Proceeding is a "core" bankruptcy proceeding over which the Bankruptcy Court has exclusive subject matter jurisdiction.  As the Bankruptcy Court correctly held, "[b]ankruptcy core jurisdiction extends to all civil proceedings arising under Title 11 or arising in a case under Title 11," and bankruptcy courts are empowered to hear, determine, and enter appropriate orders and judgments with respect to all such "core proceedings."  (Ord. at 9.)  The Bankruptcy Court, however, erred in concluding that the Adversary Proceeding does not present such a "core" proceeding.  The Bankruptcy Court incorrectly applied the relevant standards in concluding that "claims made by Bank of America do not 'arise in' a case under the Bankruptcy Code" and completely failed to address Appellants' arguments that the State Court Action "arose under" the Bankruptcy Code.  (Ord. at 15.)

The Adversary Proceeding is "core" for at least three reasons.  First, liability in the Adversary Proceeding necessarily depends upon the Debtors' liability under an "*ipso facto*" clause that is prohibited by the Bankruptcy Code.  Second, the Adversary Proceeding seeks to penalize a bankruptcy filing – an issue that has been exclusively reserved to Congress and the federal courts.  Third, because the Guarantees at the heart of the Adversary Proceeding encumber access to bankruptcy and the proper exercise of fiduciary duties, the claims in the Adversary Proceeding seeking to enforce the Guarantees are preempted by federal law.  For all these reasons, this Court should reverse the Remand Order and direct the Bankruptcy Court to exercise the subject matter jurisdiction that plainly exists over the Adversary Proceeding.

**A. The Adversary Proceeding is "Core" Because Liability Necessarily Depends Upon an "Ipso Facto" Clause Prohibited by the Bankruptcy Code**

The Bankruptcy Code expressly renders unenforceable contractual provisions that inflict a penalty or forfeiture upon a debtor solely because of its bankruptcy filing. Contractual provisions that punish a party's insolvency are commonly referred to as "*ipso facto*" clauses, and are banned by several provisions of the Bankruptcy Code because they impermissibly burden a federal right. Thus, for example, Section 365(e)(1)(B) of the Bankruptcy Code invalidates defaults in executory contracts arising from *ipso facto* clauses by "render[ing] unenforceable contract provisions that alter[] the rights or obligations of a debtor as a result of the debtor's commencement of a case under the Bankruptcy Code." In re Chateaugay Corp., No. 92-7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *14-15 (S.D.N.Y. May 10, 1993); see also 11 U.S.C. § 365(e)(1)(B). As the Bankruptcy Court itself acknowledged in another recent case, "section 365 abrogates the power of *ipso facto* clauses, and, therefore, [n]o default [or change in debtor's rights] may occur pursuant to an *ipso facto* clause." JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC, No. 09-01132 (JMP), 2009 Bankr. LEXIS 3609, at *67 (Bankr. S.D.N.Y. Nov. 17, 2009) (citations omitted) (recognizing the "overriding federal bankruptcy policy that *ipso facto* clauses are, as a general matter, unenforceable").[7] Similarly, Section 541(c) of the Bankruptcy Code nullifies any exclusion of property from a debtor's estate based on an *ipso facto* clause, see 11 U.S.C. § 541(c), and Section 363 invalidates contracts that deprive debtors of the use of property based on a bankruptcy filing. See 11 U.S.C. § 363.

Here, the Bankruptcy Court erred by failing to recognize that the Loan Agreements with the Debtors contained impermissible *ipso facto* clauses that punished the Debtors by creating recourse liability – the liability to which the Guarantees are subject – upon the filing of a bankruptcy petition. Any resolution of liability on the Guarantees must, as a threshold matter, first resolve whether the Debtors themselves are liable, *ipso facto*, upon the bankruptcy filing. The

---

[7] See also In re Texaco Inc., 73 B.R. 960, 964-65 (Bankr. S.D.N.Y. 1987); 3 Collier on Bankruptcy ¶ 365.07 (Matthew Bender 15th ed. rev.).

Bankruptcy Court ignored this threshold issue, instead placing its singular focus on the language in the Guarantees referring to each of the Guarantors as "a primary obligor."  (Ord. at 14; Guar. § 1.1.)  The "primary" nature of the obligation, however, only means that, once liability is determined, it is a direct obligation of the Guarantors that is not discharged by the Debtors' bankruptcy.  The Bankruptcy Court's reliance upon the reference to "primary obligor" begs the question of *what* the Guarantors' obligation actually is:  a promise to pay whatever liabilities are determined to be assertable on a full recourse basis against the Debtors by reason of the Debtors' bankruptcy filing.  Thus, the more significant term in the Guarantees – and one which the Bankruptcy Court glossed over – is the "Guaranteed Obligations" that the Guarantors ostensibly insured.  Section 1.2 of the Guarantees defines "Guaranteed Obligations" as "(i) *the obligations or liabilities of Borrower [i.e., the Debtors] to Lender under Section 9.4 of the Loan Agreement[s],*" and (ii) certain other costs incurred by the lenders, subject to a $100 million aggregate cap.  (J. App. Tab 7 Ex. E; Guar. § 1.2) (emphasis added).  Accordingly, this is not a guaranty in which the guarantor has simply agreed to pay a loan on a primary basis.  Rather, it is a derivative obligation on a springing recourse debt allegedly owed by the Debtors.  Consequently, if the Debtors have no primary recourse liability under the Loan Agreements – and they do not as a matter of federal law – there can be no finding of liability of the Appellants under the Guarantees.

In Section 9.4 of the Loan Agreements, the Debtors agreed to a carve-out from their non-recourse liability, such that their lenders would have recourse against them upon the commission of one or more of 19 enumerated "bad boy" acts.  By including the filing of a bankruptcy petition within the "bad boy" acts, however, Section 9.4 purported to impose recourse liability upon the Debtors for that filing, thus making Section 9.4 an "*ipso facto*" clause prohibited by the Bankruptcy Code.  At the very least, the fundamental question – whether Section 9.4's imposition of recourse liability upon the Debtors for filing a bankruptcy petition constitutes a prohibited *ipso facto* clause – is a predicate determination that only a federal court can make.  Because *ipso facto* clauses are prohibited by the Bankruptcy Code, their enforceability necessarily involves federal statutory construction, which falls solely within the province of the federal courts.  As Appellants

argued at the Hearing, because "[on] the face of the complaint . . . [t]here's ipso facto liability enforceable against the debtor . . . aris[ing] under Title 11 . . . [which is] a bankruptcy law issue[]," until the enforceability, and extent of, the Debtors' primary liability under the Loan Agreements can be established, there can be no liability under the Guarantees.  (J. App. Tab 3; Tr. at 39-40.)  See also In re Farmland Industries, Inc., 296 B.R. 497, 500 (Bankr. W.D. Mo. 2003) (reversing abstention in holding that a challenge to an *ipso facto* clause was a core issue and "a matter of federal bankruptcy law, not state law"); In re Chedick, No. 95-01096, 1996 WL 762329, at *3 (Bankr. D.D.C. Mar. 22, 1996) ("[Ipso facto] provisions are invalid because they work a forfeiture or punishment for filing bankruptcy.").

Failing to recognize the prohibited *ipso facto* nature of Section 9.4, the Bankruptcy Court viewed the Adversary Proceeding as merely "a standard contract case between two non-debtors that arises under New York law."  As a result, the Bankruptcy Court erroneously concluded that it "does not present bankruptcy issues and does not arise under the Bankruptcy Code.  (Ord. at 14.) In placing undue emphasis on the identity of the parties and the contractual nature of the Guaranty claims, the Bankruptcy Court clearly erred in failing to recognize that the primary obligation that the Guarantees insure – the Debtors' purported "bad boy" recourse liability under the Loan Agreements upon the filing of bankruptcy – is an *ipso facto* clause rendered unenforceable under multiple sections of the Bankruptcy Code.  Adversary proceedings that involve a cause of action determined by, or involving interpretation of, a statutory provision of the Bankruptcy Code "arise under" Title 11 for purposes of 28 U.S.C. § 1334.  See In re Vienneau, 410 B.R. 329, 334 (Bankr. D. Mass. 2009); In re Wilborn, 401 B.R. 872, 880 (Bankr. S.D. Tex. 2009).

## B.  Because the Imposition of Penalties Based Upon a Bankruptcy Filing is Exclusively Reserved to the Federal Courts, Appellees' Claims are Preempted by Federal Law

Related to the first issue, Appellants argued below that the Adversary Proceeding was completely preempted by federal law because it sought to impose liability upon the filing of a bankruptcy petition.  The Bankruptcy Court erroneously dismissed this argument.  (Ord. at 15.)

13

The Bankruptcy Court's conclusion fails to recognize that the imposition of damages or penalties incident to a bankruptcy filing is a power statutorily reserved to the federal courts.

The "complete preemption doctrine" provides that the policy interests underpinning certain federal statutes, such as the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure, are "so strong that they 'completely preempt' an area of state law." In re Miles, 430 F.3d 1083, 1088 (9th Cir. 2005).  When such a statute is implicated, "any claim purportedly based on that preempted state law is considered, from its inception, a federal claim, and therefore *arises under* federal law." Id. (emphasis added).  Here, Appellees freely concede that their Guaranty claims are based on ESI's filing of "voluntary petitions under the Bankruptcy Code." (J. App. Tab 6 at 5; J. App. Tab 7 Ex. B at 3, 11.)  Because the adjudication of damages claims or penalties resulting from bankruptcy filings is within the exclusive province of the federal courts, the Adversary Proceeding is derivative of the Bankruptcy Case, and the doctrine of complete preemption requires that Appellees' state law claims be recharacterized as arising under federal law and be heard in the Bankruptcy Court.  See Stewart v. U.S. Bancorp, 297 F.3d 953, 958 (9th Cir. 2002).

In Gonzales v. Parks, 830 F.2d 1033 (9th Cir. 1987), the Ninth Circuit held that Fed. R. Bankr. P. 9011 represented an express Congressional grant of power to the bankruptcy courts to impose sanctions for improper bankruptcy filings.  In doing so, the Gonzales court held:

> That Congress' grant to the federal courts of exclusive jurisdiction over bankruptcy petitions precludes collateral attacks on such petitions in state courts is supported by the fact that remedies have been made available in the federal courts to creditors who believe that a filing is frivolous. . . .  Congress' authorization of certain sanctions for the filing of frivolous bankruptcy petitions should be read as an implicit rejection of other penalties, including the kind of substantial damage awards that might be available in state court tort suits. . . . *[I]t is for Congress and the federal courts, not the state courts, to decide what incentives and penalties are appropriate for use in connection with the bankruptcy process and when those incentives or penalties shall be utilized.*

830 F.2d at 1035-36 (emphasis added); see also In re 2218 Bluebird Ltd. P'ship, 41 B.R. 540, 542-43 (Bankr. S.D. Cal. 1984) (violations of implied requirement of good faith when filing bankruptcy petitions fall properly within the authority of the bankruptcy court to sanction); In re Villareal, 46

B.R. 284, 286 (Bankr. C.D. Cal. 1984) (imposing sanctions based on finding that debtor's filing was "an abuse of the bankruptcy process"); Fed. R. Bankr. P. 9011.

Similarly, Section 303(i) of the Bankruptcy Code explicitly grants bankruptcy courts the authority to adjudicate claims for damages proximately caused by the filing of involuntary bankruptcy petitions.  See 11 U.S.C. § 303(i).  Although the damages sought by Appellees here flow from ESI's *voluntary* filing, the point is the same:  Section 303(i)'s express jurisdictional grant is strongly suggestive of Congressional intent that federal law occupy the field, such that state court adjudication of the Adversary Proceeding is preempted.  In Miles, the Ninth Circuit upheld the lower court's denial of remand based on the finding that Section 303(i) of the Bankruptcy Code "provides the exclusive cause of action for damages predicated upon the filing of an involuntary bankruptcy petition."  430 F.3d at 1091.  In so holding, the Ninth Circuit reasoned that:

> [p]ermitting state courts to decide whether the filing of an involuntary bankruptcy petition was appropriate would subvert the exclusive jurisdiction of the federal courts and undermine uniformity in bankruptcy law by allowing state courts to create their own standards as to when a creditor may properly file an involuntary petition.
> . . .
>
> Because Congress intended the Bankruptcy Code to create a whole scheme under federal control that would adjust *all* of the rights and duties of creditors and debtors alike . . . we can infer . . . that Congress did not intend third parties to be able to circumvent this rule by pursuing those very claims in state court.

Id. at 1090-91 (emphasis in original).

Courts within this Circuit and District have similarly held.  See, e.g., Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank, 236 F.3d 117, 120-21 (2d Cir. 2001) (federal preemption doctrine requires that any state law claim based on conduct in a bankruptcy case be asserted in the first instance in bankruptcy court (and not even in the federal district court)); Astor Holdings, Inc. v. Roski, 325 F. Supp. 2d 251, 262 (S.D.N.Y. 2003) (dismissing state law claims based on defendant's having caused a bankruptcy filing, holding that, under federal preemption doctrine, "no authorized proceeding in bankruptcy can be questioned in a state court or used as the basis for

the assertion of a [state law claim]"); Phoenix Elec. Contracting, Inc. v. Lovece, No. 93-4340 (LMM), 1993 WL 512917, at *3 (S.D.N.Y. Dec. 9, 1993) (denying motion to remand or abstain from adjudicating a state law claim that "represents a collateral attack on the validity of an action taken in a bankruptcy proceeding and, therefore, raises the question whether federal bankruptcy law preempts the claim"); In re Pease, 195 B.R. 431, 435 (Bankr. D. Neb. 1996) ("The Bankruptcy Code pre-empts the private right to contract around its essential provisions.").

      Here, Appellees affirmatively allege that Appellants' "springing liability" under the Guarantees was triggered by ESI's bankruptcy filing (Remand Mot. at 5) – even though that filing was the only reasonable course left for Appellants, as fiduciaries, to protect the Debtors and their stakeholders. The Guarantees created enormous disincentives against a necessary and appropriate use of Chapter 11 and, by the rationale of Gonzalez and Miles, allowing a state court to adjudicate the propriety of those disincentives would impermissibly "subvert [the] exclusive federal jurisdiction" that has been granted to bankruptcy courts. See Gonzalez, 830 F.2d at 1036-37. Indeed, the language of the Guarantees themselves admits the possibility of preemption: "[T]his Guaranty . . . is enforceable in accordance with its terms, except as limited by bankruptcy, insolvency or other laws of general application relating to the enforcement of creditors' rights." (J. App. Tab 7 Ex. E; Guar. § 3.5.) Because the "Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant," see Gonzalez, 830 F.2d at 1036, the Bankruptcy Court failed to recognize that Appellees' state law claims are preempted, and its Remand Order should be reversed.

## C. Because the Guarantees Encumber Access to Bankruptcy and the Proper Exercise of Fiduciary Duties, They Are Void as a Matter of Public Policy

      Filing for bankruptcy is often the most economically efficient way for an insolvent entity to preserve assets for parties in interest, because "a business is worth more to everyone alive than dead." In re Global Serv. Group LLC, 316 B.R. 451, 460 (Bankr. S.D.N.Y. 2004).[8] In compliance

---

[8] Indeed, as the Debtors' senior secured creditors threatened here (J. App. Tab 11 Ex. 4), breach of fiduciary duty claims have been brought against directors for *failing* to file for bankruptcy more quickly than they did. See, e.g., Ex parte Smith, 942 So. 2d 356, 357 (Ala. 2006).

with his fiduciary duties to protect those assets, Appellant Lichtenstein authorized the Debtors' bankruptcy filing.  As the Adversary Proceeding makes clear, however, the Guarantees created prohibitive financial disincentives against filing for bankruptcy.

It is well-settled that contracts that encumber the free exercise of fiduciary duties are void as a matter of public policy.  See, e.g., Wisconsin Ave. Assocs., Inc. v. 2720 Wisconsin Ave. Coop. Ass'n, Inc., 441 A.2d 956, 965 (D.C. Ct. App. 1982) (contract clause "which served to foster and to insulate breaches of fiduciary duty . . . is illegal and void"); Stearns v. Williams, 240 P.2d 833, 840 (Idaho 1952) (public policy favors voiding agreements "made with a view to place one under wrong influences, such as those which offer . . . a temptation to do that which may affect injuriously the right and interest of third persons . . . ."); Restatement (Second) of Contracts § 193 (1981) ("A promise by a fiduciary to violate his fiduciary duty or a promise that tends to induce such a violation is unenforceable on grounds of public policy.").

These principles have been applied in the bankruptcy context.  See, e.g., U.S. Lines, Inc., 103 B.R. 427, 431 n.1 (Bankr. S.D.N.Y. 1989) ("[T]he fiduciary duty of the debtor-in-possession . . . cannot be contracted away.  A promise by a fiduciary tending to violate his fiduciary duty is unenforceable on grounds of public policy.").  Specifically, agreements by which a party directly or indirectly waives future access to bankruptcy protection are unenforceable as violative of public policy.  See, e.g., In re Madison, 184 B.R. 686, 690 (Bankr. E.D. Pa. 1995) ("[A]n agreement not to file [for] bankruptcy is unenforceable because it violates public policy . . . . As a matter of policy, it has been pointed out that, if agreements prohibiting bankruptcies were given force, the Code could be nullified in the vast majority of debts arising out of contracts.") (citations omitted); see also In re Tru Block Concrete Prods., Inc., 27 B.R. 486, 492 (Bankr. S.D. Cal. 1983) ("It is a well settled principle that an advance agreement to waive the benefits conferred by the bankruptcy laws is wholly void as against public policy."); U.S. v. Royal Bus. Funds Corp., 724 F.2d 12, 15 (2d Cir. 1983) (recognizing that the general rule is that "a debtor may not agree to waive the right to file a bankruptcy petition").

17

Waivers of bankruptcy protection are void not only when made by debtors, but also by insiders, like Lichtenstein (who are often guarantors), that occupy positions of control over the debtor's affairs.  See Michael D. Fielding, Preventing Voluntary and Involuntary Bankruptcy Petitions by Limited Liability Companies, 18 Bank. Dev. J. 51, 64-66 (2001) ("[P]ersonal guaranties [seemingly] violate bankruptcy policy because they . . . [may] cause the insider to violate his fiduciary duties to other creditors of the company because there is an inherent conflict between the insider's self-interest and the best interest of the company's creditors.").[9] Handicapping a corporate officer with personal disincentives is tantamount to handicapping the Debtors themselves.  Obviously, a party may not do indirectly what it is prohibited from doing directly.  See, e.g., Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union, 222 F. Supp. 125, 130 (E.D.N.Y. 1963) ("Certainly, one should not be permitted to do indirectly what one may not do directly.").

In imposing steep penalties on parties for seeking bankruptcy protection, the Guarantees explicitly both encumbered the free access to bankruptcy court and impeded the faithful exercise of fiduciary duties that would otherwise compel such a filing.  It is manifestly improper for a state court to decide the extent to which bankruptcy protection may be contractually restricted.  Because the Bankruptcy Court is uniquely situated to address the important federal policy questions that the Adversary Proceeding implicates, jurisdiction must be retained there.  See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC,  No. 09-11435 (JMP), 2009 Bankr. LEXIS 1738, at *16 (Bankr. S.D.N.Y. July 7, 2009) (holding that federal jurisdiction is properly retained where proceedings are "unique to or uniquely affected by the bankruptcy proceedings").

---

[9] Appellees cannot properly argue that Appellants ratified the Guaranty or waived objection to its enforceability by completing the Acquisition and subsequently filing for bankruptcy.  Contracts that are void on policy grounds cannot be rendered effective through a party's conduct.  See 7A William Meade Fletcher et al., Fletcher Cyc. Corp. § 3612 (perm. ed., rev. vol. 2009) ("Ratification of an illegal contract will not make the contract effective."); Sirkin v. The Fourteenth St. Store, 124 A.D. 384, 391 (N.Y. App. Div. 1st Dep't  1908).("The public policy of our state forbids the *ratification*, as well as the *making*, of [an illegal] contract.") (emphasis in original).

The Bankruptcy Court dismissed Appellants' public policy arguments with the observation that "the disincentives to commencing a case under the Bankruptcy Code failed to function as intended and cases actually were filed.  Because the Debtors now are in Chapter 11 and Lichtenstein, as president, chief executive and chairman did, in fact, authorize such filings, public policy arguments relating to the guaranty claims are of minimal relevance."  (Ord. at 16.)  The Bankruptcy Court's reasoning is flawed because, among other reasons, it confuses the merits of the argument with the jurisdictional question – whether, as a policy matter, a federal or state court should determine whether access to bankruptcy protection is impermissibly impaired by a contractual penalty.

In unduly focusing on the lack of actual deterrence here, the Bankruptcy Court fundamentally misapprehended the function of a public policy argument, which is concerned not so much with rectifying actions of present litigants as it is with avoiding an undesirable "chilling effect" on the conduct of future ones.  See, e.g. Marquart v. Lodge 837, Int'l Ass'n of Machinists & Aerospace Workers, 26 F.3d 842, 849 (8th Cir. 1994) ("[W]e look to the courts to articulate public policy.  This conception of the role of the judiciary looks beyond the litigants to the effect the judicial decision has on future litigants.") (citation omitted).  Even the Bankruptcy Court itself acknowledged at the Hearing that the enforceability of bankruptcy-triggered recourse liability is a highly topical issue in light of the wave of insolvencies afflicting the commercial real estate sector and the ubiquity of such bankruptcy-proofing provisions in standard commercial real estate contracts.  (J. App. Tab 3; Tr. at 153-54.)  Specifically, the Court acknowledged the potential far-reaching behavioral impact of its ruling by noting:  "[T]here are significant transactions not in bankruptcy potentially to be affected by this ruling . . . ."  (Id. at 153.)  Irrespective of the merits, therefore, the Bankruptcy Court fundamentally erred in citing the lack of deterrence as justification for declining to exercise jurisdiction.

Finally, in reasoning that there was no ostensible "chilling effect" on the filing here, the Bankruptcy Court ignored well-accepted case law in which federal jurisdiction was predicated on the *mere threat* of deterrence, even where the threat did not operate to impede the protected

conduct.  In <u>Gonzales</u>, the Ninth Circuit held that exclusive federal bankruptcy jurisdiction existed over state tort law claims based on a bankruptcy filing, even where such filing was made, because "the mere possibility of being sued . . . in state court could in some instances deter persons from exercising their rights in bankruptcy."  830 F.2d at 1036.  Likewise, in <u>MSR Exploration v. Meridian Oil</u>, the court held that exclusive bankruptcy jurisdiction existed over state law claims that challenged an actual bankruptcy filing because "[t]he threat of later state litigation may well interfere with the filings of claims by creditors" and with other aspects of the administration of "the bankruptcy process."  <u>MSR Exploration, Ltd. v. Meridian Oil, Inc.</u>, 74 F.3d 910, 916 (9th Cir. 1996); <u>see also</u> <u>Eastern Equip.</u>, 236 F.3d at 121 (endorsing the holding in <u>MSR Exploration</u> by holding there is exclusive federal jurisdiction over state law claims that merely *threaten* to "prevent individuals from exercising their rights in bankruptcy").

**D.  The Adversary Proceeding "Arises In" the Bankruptcy Code Because the Debtors' Filing of Their Bankruptcy Petition Triggered the Adversary Proceeding**

While the foregoing arguments relate to the Bankruptcy Court's core "arising under" jurisdiction, the Bankruptcy Court also has core "arising in" jurisdiction.  Courts have explicitly found that guaranty agreements between non-debtors predicated on a bankruptcy filing, such as those at issue here, "arise in" bankruptcy cases.  <u>See, e.g.</u>, <u>In re Lucasa Int'l, Ltd.</u>, 6 B.R. 717, 719 (Bankr. S.D.N.Y. 1980).  Because Appellees' claims under the Guarantees here are predicated on the bankruptcy filing and could not have existed independently of the Bankruptcy Case, the Adversary Proceeding necessarily "arises in" the Bankruptcy Case.

In rejecting Appellees' "arising in" argument, the Bankruptcy Court adopted an exceedingly narrow and incorrect view of "arising in" jurisdiction, holding that, if a claim, under other factual circumstances, could arise outside of a bankruptcy, it could never be considered as "arising in" a bankruptcy case, even where circumstances relate the two.  (Ord. at 15.)  Neither the cases cited by the Bankruptcy Court nor the weight of authority support that proposition.  For example, the Bankruptcy Court cited <u>Geruschat v. Ernst & Young LLP</u>, 505 F.3d 237, 239 (3d Cir. 2007), for its proposition.  In <u>Geruschat</u>, however, the court found "arising in" jurisdiction over

state law malpractice, negligence, and fraud claims against non-debtor accountants – claims that clearly exist independent of a bankruptcy.  See Geruschat 505 F.3d at 239-42, 267.

The test is not, as the Bankruptcy Court held, whether the claims could in other contexts exist outside of bankruptcy, but rather whether, in the instant context, the bankruptcy case itself or actions taken therein, constituted the "but for" cause of the claims.  See D.A. Elia Constr. Corp. v. Damon & Morey, LLP, 389 B.R. 314, 318 (W.D.N.Y. 2008) ("But for [the law firms'] representation of [the debtor] in the bankruptcy case, there would be no cause of action. . . . Therefore, removal of this action was proper under 28 U.S.C. § 1452(a) and the motion to remand is denied.").  Here, the Appellees' claim could not "have been the subject of a lawsuit absent the filing of a bankruptcy case," see 1-3 Collier on Bankruptcy, supra, ¶ 3.01[4][c][iv]; but for the bankruptcy, Appellees' cause of action would not exist.  See Nemsa Establishment, S.A. v. Viral Testing Sys. Corp., No. 95-0277, 1995 WL 489711, at *2 (S.D.N.Y. Aug. 15, 1995) ("arising in" proceedings are those that "would have no existence outside of bankruptcy").  Where, as here, there is a "but for" causal relation between the filing of ESI's bankruptcy petition and the very existence of Appellees' claims, the Bankruptcy Court should have found "arising in" jurisdiction.

## II.  Because the Adversary Proceeding May Give Rise to Indemnification Rights Against, and Potential Liability of, the Debtors, It Threatens an Adverse Impact on the Handling and Distribution of the Bankruptcy Estate

Even if the Adversary Proceeding did not invoke the Bankruptcy Court's core jurisdiction, it still falls within its "related to" subject matter jurisdiction.  "Related to" jurisdiction extends to any civil proceeding whose outcome might have "any conceivable effect" on, or "any significant connection" to, the bankruptcy estate.  In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992).  It has been construed broadly to encompass any case – whether or not against the debtor – whose "outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate."  In re Pacor, Inc. v. Higgins, 743 F.2d 984, 994 (3d Cir. 1984); see also

Nemsa, 1995 WL 489711, at *2-3 (noting adoption of Pacor standard by courts within the Second Circuit).

Here, the Bankruptcy Court erroneously concluded that the Adversary Proceeding could have no impact whatsoever on the administration of the Debtors' estate and, thus, that it did not fall within the Court's "related to" jurisdiction. The Bankruptcy Court focused repeatedly on Appellants' purported waiver of indemnity or contribution rights against the Debtors in the Guarantees. (See Ord. at 13, 14, 16.) The Bankruptcy Court was incorrect, however, both in its conclusion that no indemnification rights exist here and in its view that indemnification rights are the sole proxy for determining impact upon the bankruptcy estate.

First, irrespective of the language of the Guarantees, the Debtors' Term Sheet expressly contemplates the estate's indemnification of Lichtenstein, a disbursement of Debtor funds for his litigation defense relating to the Guarantees, and the transfer of creditors' rights and remedies under the Guarantees to the Debtors upon confirmation of the proposed plan. (J. App. Tab 2 Ex. C at 7-8.) Clearly, then, if a reorganization plan were approved substantially as set forth in the Term Sheet, determinations of liability under the Guarantees would have a dramatic impact on the handling and administration of the Debtors' estate. See In re Masterwear Corp., 241 B.R. 511, 516-17 (Bankr. S.D.N.Y. 1999) (implied-in-law right of non-debtor to recover legal fees and expenses from debtor sufficient to give rise to "related to" jurisdiction). The Remand Order also completely ignores the fact that Section 10.13 of the Loan Agreements provides that the Debtors are obligated to indemnify the *lenders* for costs relating to enforcement of the Guarantees, so the impact on the Debtors' estate is undeniable. See River Ctr. Holdings, LLC v. Korff, 288 B.R. 59, 63-64 (Bankr. S.D.N.Y. 2003) (Gerber, J.) (holding, on almost identical facts, that a guaranty action "would have an economic effect on the estate and its other creditors" where an agreement *other than the guaranty* provided for a right of indemnification for attorneys' fees against the estate).

Second, the Bankruptcy Court erred in concluding that indemnification rights are the *sine qua non* of determining impact on the bankruptcy estate. See 1-3 Collier on Bankruptcy, supra, ¶

22

3.01[4][c][ii][B] ("'[A]utomatic' liability of the estate is not the *sine qua non* of related-to jurisdiction. . . . Thus, whether contribution or indemnity claims would ever exist . . . was not determinative.  The fact that they *could* happen was sufficient to find "related to" jurisdiction.") (emphasis in original); 2 Collier on Bankruptcy, supra, ¶ 105.03[2][a] (actions subjecting key participants in a reorganization are properly enjoined, even where they have "no rights of contribution or indemnity against the estate").  As expansive case law, including decisions of the Bankruptcy Court, make clear, there are a host of reasons having nothing to do with indemnification rights on which a court could properly base its determination that a civil proceeding – and particularly one seeking enforcement of a guaranty – invokes bankruptcy jurisdiction.  See, e.g., Pacor, 743 F.2d at 995 ("[E]ven in the absence of an explicit indemnification agreement, an action by a creditor against a guarantor of a debtor's obligations will necessarily affect that creditor's status vis-à-vis other creditors, and administration of the estate therefore depends upon the outcome of that litigation."); see also Industri & Skipsbanken A/S v. Levy, 183 B.R. 58, 65 (Bankr. S.D.N.Y. 1995) ("[A]n action on a personal guaranty for the debts of a debtor in bankruptcy is within the jurisdiction of the bankruptcy court."); In re Am. Hardwoods, 885 F.2d 621, 623-24 (9th Cir. 1989) (finding "related to" jurisdiction where enforcement of state-court judgment against debtor's guarantors could affect administration of reorganization plan); In re Rome Family Corp., No. 02-11771, 04-1048, 2005 WL 1030425, at *3 (Bankr. D. Vt. May 2, 2005) (holding "related to" jurisdiction especially appropriate in "an action by a creditor against a guarantor of the Debtor's obligations where the guarantor was an officer, director and shareholder of the debtor").

Even if there were no indemnification rights against the Debtors, any recovery the Appellees obtain in the State Court Action will unequivocally reduce the value of their claims against the estate and thereby increase the funds available to creditors subordinate to them in the capital stack.  See River Ctr. Holdings, 288 B.R. at 71 (denying remand, in part, because of the

"domino effect" that any recovery awarded in the guaranty action would have on other creditors).[10] Clearly, in a complex capital structure such as that here, the subordination and turnover provisions in the various loan documents make entitlement to ultimate recovery, and even standing to bring claims on the Guarantees, impossible to determine absent final approval of a reorganization plan. (See J. App. Tab 11 Ex. 3, Intercreditor Agreement §§ 6(b), 11(d)(iii), 15(q); and J. App. Tab 7 Ex. D; Loan Agreement § 10.25.)  The bankruptcy distribution would therefore be dramatically altered by the Adversary Proceeding, even if no indemnification rights existed.

 Without addressing Appellants' many arguments highlighting the extensive nexus between the Adversary Proceeding and the Bankruptcy Case (see J. App. Tab 10; Appellants' Opp. Br.), the Bankruptcy Court ruled that, "upon reading the Guaranty Agreements, it is clear that Bank of America's claim in the state law action is entirely independent of any claims Bank of America may have against the Debtors."  (Ord. at 14.)  The Bankruptcy Court thus erred by construing the language of the Guarantees in a vacuum.  The Guarantees – which themselves define liability only by reference to the Loan Agreements – are part of a complex system of contemporaneously executed and interlocking loan agreements, no one of which may properly be viewed in isolation. As the Bankruptcy Court itself stated in the recent Charter Communications case, an "adversary proceeding cannot be viewed in a vacuum [where] it is being prosecuted with vigor in conjunction with [a party's] plan objections."  2009 Bankr. LEXIS 1738, at *18.  Rather, where, as here, a guaranty derives from the same set of "operative facts" as the underlying loan agreements in a bankruptcy case, it is proper for the bankruptcy court to retain jurisdiction.  See U.S. Lines, 169 B.R. at 814 (a bankruptcy court can resolve state law breach of contract actions against a stranger

---

[10] See also In re Lyondell, 402 B.R. 571, 584 (Bankr. S.D.N.Y. 2009) ("[B]y bringing claims against [the guarantor], [the Guaranty Creditors] risk damaging the very Debtors against whom they have their claims and diminishing the value of their own claims as well as those of all of the other creditors of those entities."); In re Worldcom, 293 B.R. 308, 323 (S.D.N.Y. 2009) ("The potential alteration of the liabilities of the estate and change in the amount available for distribution to other creditors is sufficient to find that litigation among non-debtors is 'related to' the bankruptcy proceeding."); cf. 1-3 Collier on Bankruptcy, supra, ¶ 3.01[4][c][ii][B] (citing suits by creditors against guarantors as ones in which "related to" jurisdiction is "relatively easy to decide").

to the bankruptcy case "if the contract action is inseparably and inextricably intertwined with the restructuring of debtor-creditor rights").

Third, there is clearly potential here for a direct impact on the Bankruptcy Case, where two Debtor Guarantors, ESI and Homestead, are jointly and severally liable with Appellants for any judgment obtained in the Adversary Proceeding.  (J. App. Tab 7 Ex. E, Guar. § 5.6.)  See Hickox v. Leeward Isles Resorts, 224 B.R. 533, 538 (S.D.N.Y. 1998) (holding that "related to" jurisdiction existed where debtor was jointly and severally liable with non-debtors on notes, and, therefore, litigation "could have some 'conceivable effect' on the administration of the debtor estate").

For each and all of the foregoing reasons, the Bankruptcy Court erred in its conclusion that Appellees' "efforts to recover the guaranteed obligations stand on their own and do not directly impact the Debtors." (Ord. at 13-14.)  Accordingly, the Bankruptcy Court has "related to" jurisdiction over the Adversary Proceeding and this Court should reverse the Remand Order.

## CONCLUSION

For all of the foregoing reasons, this Court should reverse the Bankruptcy Court and order that it retain jurisdiction over this matter.

Dated: New York, New York
      December 21, 2009

KASOWITZ, BENSON, TORRES
  & FRIEDMAN LLP

By: /s/ Adina G. Storch
    David M. Friedman (dfriedman@kasowitz.com)
    Christopher P. Johnson (cjohnson@kasowitz.com)
    Adina G. Storch (astorch@kasowitz.com)
    1633 Broadway
    New York, NY  10019
    (212) 506-1700
    *Attorneys for Appellants Lightstone Holdings LLC and David Lichtenstein*